# UNITED STATES DISTRICT COURT
## DISTRICT OF MAINE

| | | |
|---|---|---|
| *CARY DEPAOLO,* | ) | |
| | ) | |
| *Plaintiff* | ) | |
| | ) | |
| *v.* | ) | *No. 2:16-cv-00468-NT* |
| | ) | |
| *GHM PORTLAND MAR, LLC, d/b/a* | ) | |
| *PORTLAND MARRIOTT* | ) | |
| *AT SABLE OAKS,* | ) | |
| | ) | |
| *Defendant* | ) | |

## RECOMMENDED DECISION ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

Defendant GHM Portland MAR, LLC, d/b/a Portland Marriott at Sable Oaks ("GHM"), moves for summary judgment as to all of plaintiff and former employee Cary DePaolo's claims against it. *See* Defendant's Memorandum of Law in Support of Motion for Summary Judgment ("Motion") (ECF No. 55) at 1; Complaint and Jury Trial Demand ("Complaint") (ECF No. 1) ¶¶ 26-34 (asserting claims for discrimination, retaliation, and creation of a hostile work environment in violation of the Maine Human Rights Act ("MHRA"), 5 M.R.S.A. § 4551 *et seq.*, the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101 *et seq.*, and the Maine Whistleblowers' Protection Act ("MWPA"), 26 M.R.S.A. § 831 *et seq.* (Count I), and interference with and retaliation for leave taken pursuant to the Family and Medical Leave Act ("FMLA"), 29 U.S.C. § 2601 *et seq.* (Count II)).

DePaolo concedes GHM's entitlement to summary judgment as to his disability claims in Count I predicated on a "failure to accommodate" and his claim for FMLA retaliation in Count II, but otherwise contests its motion. *See* Plaintiff's Memorandum in Opposition to Summary

Judgment ("Opposition") (ECF No. 61) at 3-19.[1]  For the reasons that follow, I recommend that the court grant the motion in part, as to the conceded claims, and otherwise deny it.

## I.   Applicable Legal Standards

## A.   Federal Rule of Civil Procedure 56

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Ahmed v. Johnson*, 752 F.3d 490, 495 (1st Cir. 2014).  "A dispute is genuine if 'the evidence about the fact is such that a reasonable jury could resolve the point in favor of the non-moving party." *Johnson v. Univ. of P.R.*, 714 F.3d 48, 52 (1st Cir. 2013) (quoting *Thompson v. Coca-Cola Co.*, 522 F.3d 168, 175 (1st Cir. 2008)).  "A fact is material if it has the potential of determining the outcome of the litigation." *Id.* (quoting *Maymi v. P.R. Ports Auth.*, 515 F.3d 20, 25 (1st Cir. 2008)).

The party moving for summary judgment must demonstrate an absence of evidence to support the nonmoving party's case.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986).  In determining whether this burden is met, the court must view the record in the light most favorable to the nonmoving party and give that party the benefit of all reasonable inferences in its favor. *Johnson,* 714 F.3d at 52.  Once the moving party has made a preliminary showing that no genuine issue of material fact exists, the nonmovant must "produce specific facts, in suitable evidentiary form, to establish the presence of a trialworthy issue." *Brooks v. AIG SunAmerica Life Assur. Co.*, 480 F.3d 579, 586 (1st Cir. 2007) (quoting *Clifford v. Barnhart,* 449 F.3d 276, 280 (1st Cir. 2006) (emphasis omitted)); Fed. R. Civ. P. 56(c).  "As to any essential factual element of its claim on

---

[1] DePaolo states that he withdraws the "failure to accommodate" and FMLA retaliation claims but leaves to the court's discretion whether he should file a motion to dismiss them or they should be disposed of on summary judgment. *See* Opposition at 3 n.1.  For the sake of expediency, I have treated his withdrawal of those claims as a concession that GHM is entitled to summary judgment with respect to them.

which the nonmovant would bear the burden of proof at trial, its failure to come forward with sufficient evidence to generate a trialworthy issue warrants summary judgment to the moving party." *In re Spigel*, 260 F.3d 27, 31 (1st Cir. 2001) (citation and internal punctuation omitted).

## B.  Local Rule 56

The evidence that the court may consider in deciding whether genuine issues of material fact exist for purposes of summary judgment is circumscribed by the local rules of this district. *See* Loc. R. 56.  The moving party must first file a statement of material facts that it claims are not in dispute.  *See* Loc. R. 56(b).  Each fact must be set forth in a numbered paragraph and supported by a specific record citation.  *See id*.  The nonmoving party must then submit a responsive "separate, short, and concise" statement of material facts in which it must "admit, deny or qualify the facts by reference to each numbered paragraph of the moving party's statement of material facts[.]"  Loc. R. 56(c).  The nonmovant likewise must support each denial or qualification with an appropriate record citation.  *See id*.  The nonmoving party may also submit its own additional statement of material facts that it contends are not in dispute, each supported by a specific record citation.  *See id*.  The movant then must respond to the nonmoving party's statement of additional facts, if any, by way of a reply statement of material facts in which it must "admit, deny or qualify such additional facts by reference to the numbered paragraphs" of the nonmovant's statement.  *See* Loc. R. 56(d).  Again, each denial or qualification must be supported by an appropriate record citation.  *See id*.

Local Rule 56 directs that "[f]acts contained in a supporting or opposing statement of material facts, if supported by record citations as required by this rule, shall be deemed admitted unless properly controverted."  Loc. R. 56(f).  In addition, "[t]he court may disregard any statement of fact not supported by a specific citation to record material properly considered on summary

judgment" and has "no independent duty to search or consider any part of the record not specifically referenced in the parties' separate statement of fact." *Id.*; *see also, e.g., Borges ex rel. S.M.B.W. v. Serrano-Isern*, 605 F.3d 1, 5 (1st Cir. 2010); Fed. R. Civ. P. 56(e)(2) ("If a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact as required by Rule 56(c), the court may . . . consider the fact undisputed for purposes of the motion[.]").

## II. Factual Background

The parties' statements of material facts, credited to the extent that they are either admitted or supported by record citations in accordance with Local Rule 56 and viewed in the light most favorable to DePaolo as the nonmovant, reveal the following.[2]

DePaolo was hired by GHM on April 16, 1999, to work as part of its hotel maintenance staff at the Portland Marriott hotel. [Consolidated] Statement of Material Facts ("SMF") (ECF No. 62) ¶ 1. He initially reported to "Chief Engineer" Will Amedy, who in turn reported to General Manager Edward Palmer. *Id.* When Amedy was promoted and transferred from the hotel, Palmer promoted DePaolo to the Chief of Maintenance position. *Id.* ¶ 2.[3]

Jennifer Winston, formerly Jennifer Czachor, was DePaolo's Human Resources ("HR") representative. *Id.* ¶ 3. If DePaolo had an issue that he could not address with Palmer, he could report it directly to Winston. *Id.* ¶ 4. Winston began working at the Marriott at Sable Oaks in 2001. *Id.* ¶ 114. She started working in reservations, transferred to payroll and accounts payable approximately a year later, and eventually moved into HR. *Id.* She received no specific training

---

[2] I have assumed that statements that are qualified by either side are admitted, unless a qualification indicates otherwise. In many instances, I have incorporated DePaolo's qualifications into GHM's statements to the extent supported by the citations given.

[3] DePaolo refers to his initial position as that of an "engineer" and the position to which he was promoted as "Chief Engineer"; however, the official position titles were "maintenance technician" and "Chief of Maintenance." SMF ¶ 2.

for her position and became responsible for fielding complaints from employees sometime in the last five years. *Id.*

As Chief of Maintenance, DePaolo was charged with oversight of the maintenance department and was required to remain on-call at all times in case there was an emergency at the hotel. *Id.* ¶ 6. He worked five days a week, from Monday through Friday, but on occasion would be called in to work on the weekend. *Id.* ¶¶ 5, 7.

DePaolo admitted that his personality sometimes caused issues in the workplace and that complaints had been filed against him by subordinates. *Id.* ¶ 12. He stated that he would unconsciously raise his voice and that his subordinates and co-workers would perceive that as yelling. *Id.* ¶ 13. He said that this sometimes "put[] people off." *Id.* DePaolo could also be sarcastic and make jokes to his subordinates, which he believes may have contributed to the complaints from co-workers. *Id.* ¶ 14.

On or about April 12, 2011, DePaolo received a corrective action and was instructed by Palmer and Winston to treat his co-workers and colleagues more respectfully. *Id.* ¶ 15. DePaolo wrote that he felt the corrective action was "one-sided" and "sexist," although he did not elaborate on what he meant by that "because of incriminating [him]self." *Id.* On May 8, 2011, he received a performance evaluation stating that he "must show less outward frustration toward underperforming associates both in his department and others" and that "[t]here is a respectful way to critique their perfor[mance]." *Id.* ¶ 16. DePaolo recalled discussing this conduct with his supervisors at the time of his evaluation. *Id.*

In or about October 2013, DePaolo was diagnosed with non-Hodgkin's lymphoma. *Id.* ¶ 25. He did not inform anyone at GHM of his diagnosis right away. *Id.* When he informed Winston that he would require treatment for his condition in January 2014, she offered him FMLA

leave to undergo chemotherapy. *Id.* ¶ 26. On or about January 8, 2014, DePaolo completed a formal request for intermittent FMLA leave to receive chemotherapy treatment. *Id.* ¶ 27. The following day, his request for leave was granted. *Id.* ¶ 28.

DePaolo testified that he did not tell anyone about his cancer diagnosis and, with few exceptions, did not recall any specific conversations with Palmer about his diagnosis. *Id.* ¶ 29.[4] He testified that it became obvious that he was undergoing chemotherapy, and he believed that he would have had a discussion with Palmer at some point about his condition. *Id.* ¶ 30. DePaolo's condition required that he receive chemotherapy one day every three weeks. *Id.* ¶ 31. He received six chemotherapy treatments in total. *Id.* Because his treatments were on Thursdays, DePaolo would sometimes take Friday off when he didn't feel well. *Id.* ¶ 32. During his chemotherapy treatments, DePaolo never requested any days off that were denied by GHM. *Id.* ¶ 33.

DePaolo alleges that his problems with Palmer began when he started chemotherapy treatment and that he did not have any performance issues before then. *Id.* He testified that, as a result of his chemotherapy treatment, he had issues with his memory as well as difficulties with his balance and lifting heavy objects. *Id.* ¶ 34. DePaolo told Palmer that he could not climb ladders or perform heavy lifting during and after his chemotherapy treatment. *Id.* ¶ 116; Deposition of Cary A. DePaolo ("DePaolo Dep.") (ECF No. 53), Page ID # 222 at 75. DePaolo alleges that his memory issues interfered with his work, but he could not recall any particular instances when Palmer approached him about an issue or task that he had forgotten. SMF ¶ 35.[5] DePaolo alleged

---

[4] DePaolo qualifies this statement, asserting that, to the extent that Palmer knew of his cancer diagnosis, Palmer testified that he was aware that DePaolo was diagnosed with lymphoma and that he applied for and was granted FMLA leave to receive chemotherapy. SMF ¶ 29; Deposition of Edward Palmer ("Palmer Dep.") (ECF No. 53-13), Page ID # 340 at 19.

[5] DePaolo qualifies this statement, asserting that he testified that he spoke to Palmer about his memory problems, and Palmer would become upset with him. SMF ¶ 35; DePaolo Dep., Page ID # 231 at 112.

in his complaint that Palmer called him "cancer-brain" or "chemo-brain" on several occasions. *Id.* ¶ 46. During deposition, DePaolo said that he had never heard the term "cancer brain." *Id.*

DePaolo said that, on one occasion, he and Palmer were together when a delivery truck showed up carrying a heavy refrigeration unit that needed to be offloaded. *Id.* ¶ 36. According to DePaolo, Palmer said, "there's your refrigeration unit." *Id.* DePaolo then told Palmer that he could not unload the refrigeration unit due to the side effects of his chemotherapy. *Id.* ¶ 37. He suggested to Palmer that "Jesse," a younger associate who was also present, unload the unit. *Id.* Jesse then unloaded the unit. *Id.*[6] DePaolo was unsure whether Jesse did this of his own accord or at Palmer's suggestion. *Id.* ¶ 38. Palmer did not require DePaolo to unload the refrigeration unit. *Id.* ¶ 39.

DePaolo and Palmer were in an altercation sometime in or about October 2014. *Id.* ¶ 47. DePaolo testified that, during this incident, he and Palmer were standing the entire time. *Id.*; DePaolo Dep., Page ID # 225 at 87. He stated that Palmer came nose-to-nose with him and was "in [DePaolo's] face spewing, spit all over [DePaolo], and asking [DePaolo] to punch him." *Id.* DePaolo felt threatened by Palmer. *Id.*; DePaolo Dep., Page ID # 225 at 86-87. Both men were unsure of the events that preceded the altercation. SMF ¶ 48. DePaolo recalled that Palmer never mentioned anything related to his disability during the altercation. *Id.* ¶ 49.

DePaolo admitted that he wanted to "punch [Palmer] out" on several occasions and that he has a violent history. *Id.* ¶ 50.[7] DePaolo admitted that he did not find Palmer threatening, generally, but testified that he felt "threatened" by him during the "nose-to-nose" exchange and

---

[6] I grant GHM's request to strike DePaolo's qualification of paragraph 37 on the basis that it is unsupported by the citation given. SMF ¶ 37.

[7] DePaolo qualifies this statement, asserting that he stated that he had not acted on any violent thoughts since the 1980s and that, although he said that he *wanted* to punch Palmer, he actually would become anxious and throw up as a result of his interactions with him. SMF ¶ 50; Continued Deposition of Cary A. DePaolo ("DePaolo Dep. II") (ECF No. 53-23), Page ID # 309 at 194.

described feeling "degraded, frustrated" and "red in the face, hurt, disappointed, scared, [and] protective." *Id.* ¶ 51; DePaolo Dep., Page ID # 225 at 86-87.

DePaolo testified that he informed Palmer of the term "chemo brain" after DePaolo had a performance issue relating to his memory. SMF ¶ 55. He used the term "chemo brain" on that one occasion to explain his problems to Palmer. *Id.*; DePaolo Dep., Page ID ## 236-37, at 133-34. It was not meant as a joke and "wasn't to make light of the situation." *Id.* DePaolo testified that, on one occasion, Palmer called him "a chemo brain and he was disappointed in [him]" and that Palmer called him a "chemo brain" in front of associates, which he did not like. SMF ¶ 56; DePaolo Dep., Page ID # 232 at 114.

DePaolo testified that, on one occasion, Palmer was furious with him after Winston called Palmer, rather than DePaolo, to handle a phone system issue. SMF ¶ 59; DePaolo Dep., Page ID # 235 at 127. DePaolo stated that when he and Palmer went into the phone room, Palmer "yelled and screamed" at him, even though DePaolo did not "have a clue what was going on." *Id.* DePaolo testified that he was "shocked" and "speechless" at Palmer's behavior, just wanted to get out of the phone room, and asked to have Winston present because Palmer was yelling and screaming at him for reasons he did not understand. SMF ¶ 61; DePaolo Dep., Page ID # 235 at 127-28. DePaolo testified that, while Palmer got "pretty heated[,]" he did not make any comments that offended DePaolo. SMF ¶ 61. DePaolo could not recall when this incident occurred. *Id.* Palmer did not discipline DePaolo in connection with the phone incident. *Id.* ¶ 60.

On another occasion, DePaolo and a lead housekeeper got into an altercation, and Palmer had to intervene. *Id.* ¶ 62. DePaolo admitted that Palmer only became involved when it was reported that DePaolo was upstairs yelling at the lead housekeeper. *Id.* The lead housekeeper complained that DePaolo was entering the rooms before her housekeepers could collect their tips,

and there had been prior reports of stolen tips. *Id.* ¶ 63. DePaolo did not receive any disciplinary action or a dock in pay as a result of the housekeeping incident. *Id.* ¶ 64. DePaolo could not recall what Palmer said to him in connection with that incident, although he knew Palmer did not make any comments related to his disability at that time. *Id.* ¶ 65. DePaolo admitted that Palmer was "probably just doing his job" when investigating that incident. *Id.* ¶ 66. DePaolo could not recall when the incident with the housekeeper occurred. *Id.* ¶ 67. Winston's notes dated October 7, 2013, indicate that it occurred before DePaolo informed Palmer of his lymphoma diagnosis. *Id.*

On October 7, 2014, Palmer called DePaolo to a meeting in his office. *Id.* ¶ 68. Winston was also present. *Id.* DePaolo had asked that Winston be present because Palmer had been yelling and screaming at him during the phone incident. SMF ¶ 68; DePaolo Dep., Page ID # 235, at 127-28. Palmer discussed the manner in which DePaolo responded to Palmer's orders over the radio and the tone used to speak with Palmer and hotel associates. SMF ¶ 68. Palmer told DePaolo that, if his attitude toward other associates was going to continue like this, DePaolo should put in his two weeks' notice. *Id.* ¶ 69. DePaolo said that he was not going to change and would put his resignation notice in writing. *Id.* Palmer told DePaolo to think about that decision before submitting his resignation. *Id.* DePaolo "kept very quiet" during the meeting except to say that he "didn't want to be treated like this anymore" and would submit his resignation in writing. *Id.*; Note of Jennifer L. [Winston] dated October 7, 2014 ("10/7/14 Winston Note") (ECF No. 53-28).

On October 7, 2014, DePaolo submitted his resignation letter, in which he stated that he felt that he was being singled out by Palmer and that things were "not equal for everyone (not just myself) at this property." SMF ¶¶ 70-71. Palmer and Winston asked DePaolo if he would reconsider. *Id.* ¶ 72. DePaolo recanted his resignation and stayed with GHM until he took FMLA leave on January 31, 2015. *Id.*

On Saturday, January 17, 2015, a sprinkler broke and flooded the sixth floor of the Portland Marriott. *Id.* ¶ 73. Palmer was called in to the property to handle the issue and was later informed that DePaolo had been called in but had not answered. *Id.* Palmer contacted DePaolo and another hotel associate, Laurie Hamman, by text message and asked them to report to the property in the morning to coordinate the cleanup effort. *Id.* Hamman responded the following morning and reported to work an hour later. *Id.* DePaolo did not respond. *Id.*

Palmer returned to the property that Sunday morning and again attempted to contact DePaolo, but his call went straight to voicemail. *Id.* ¶ 75. Instead of returning Palmer's call, DePaolo contacted the property and said that he was ill and could not report to work. *Id.* On Monday, DePaolo contacted Palmer and said that he was sick and had lost his phone. *Id.* ¶ 76.

On Tuesday, January 20, 2015, Palmer called DePaolo into a meeting with himself and Winston to discuss their inability to reach DePaolo during the emergency. SMF ¶ 77. During their meeting, Palmer mentioned that he was considering demoting DePaolo because he could not rely on him. *Id.* DePaolo asked Palmer why he kept pulling him into these meetings and why he was "trying to push him out." *Id.*, Note of Jennifer L. [Winston] dated January 21, 2015 ("1/21/15 Winston Note") (ECF No. 53-16), Page ID # 393. He also complained that he was upset that "Ed stated in the last meeting that he didn't care if [DePaolo] had chemo brain." *Id.*

Winston and DePaolo subsequently had a conversation about DePaolo's trouble performing his job duties. SMF ¶ 78; DePaolo Dep., Page ID # 239, at 144. Winston informed DePaolo that he could take FMLA leave if he needed time off. SMF ¶ 81. DePaolo was told that, if he wanted to come back from FMLA leave, he could return only in a general maintenance

position rather than as Chief of Maintenance.  *Id*. ¶ 78; DePaolo Dep., Page ID # 239-40, at 145-46.[8]

DePaolo accepted Winston's leave offer and, on January 29, 2015, filed a formal request for FMLA leave.  SMF ¶ 81.  On January 30, 2015, he signed a personnel action notice accepting the maintenance technician position at a pay rate of $15 per hour.  *Id*. ¶ 79.  Generally, maintenance technicians were paid only between $10 and $13 per hour, but an exception was made by Winston and Palmer to pay DePaolo the elevated rate.  *Id*. ¶ 80.  Palmer ensured that, while DePaolo was on FMLA leave, he was paid his vacation pay at the original Chief of Maintenance rate of $18.42 per hour.  *Id*. ¶ 82.  DePaolo's FMLA leave was scheduled to take place from February 2, 2015, through April 25, 2014.  *Id*. ¶ 84; Employer Response to Associate's Leave Request (ECF No. 53-8), Page ID # 294.

On or about February 11, 2015, DePaolo spoke with his clinical psychologist, Katharine Mocciola, and told her that he may have signed the paperwork accepting the maintenance technician position "prematurely."  SMF ¶ 85.  He told told Mocciola that he "just wanted the meeting to end."  *Id*.; Progress Notes (ECF No. 53-20), Page ID # 472.  He also stated in that conversation that he was aware that his reduction in responsibilities and pay was not to take place until his scheduled return from FMLA leave on April 25, 2015.  SMF ¶ 85.

In or about early April 2015, DePaolo informed Winston that he would not be returning to work.  *Id*. ¶ 86.  GHM held a goodbye party for DePaolo at a quarterly celebration meeting on May 1, 2015.  *Id*. ¶ 87.  Palmer made a statement about DePaolo at the meeting, and DePaolo was presented with a Home Depot gift card.  *Id*.

---

[8] I deny GHM's request to strike the version of this meeting offered by the plaintiff on the basis that it is unsupported by the citations given.  *See* SMF ¶ 78.  I credit DePaolo's version of this sharply contested event, viewing the evidence in the light most favorable to him as nonmovant.

DePaolo stated that he did not have any issues with Palmer, respected him, and just thought "we got to a point at the hotel where somebody needed to go someplace else and it was me." *Id.* ¶ 88. When asked why he was accusing Palmer of discrimination if he had no issues with him, DePaolo stated: "Because of the incidents we run into, the badgering, harassment, that's why, but I understand that's his job." *Id.* ¶ 89.[9] When asked at deposition if anyone was treated more favorably by Palmer, DePaolo replied that Palmer treated "family members, certain associates, chef, Jill" better than him but that he was "sure everybody gets hauled on the carpet[.]" *Id.* ¶ 90; DePaolo Dep., Page ID # 242 at 154.

When asked for specifics regarding his allegations of favorable treatment, DePaolo pointed to one incident in which Palmer picked up his son, who was late for work. SMF ¶ 91. According to DePaolo, he was "sure [the son] got an ass reaming when the opportunity was there." *Id.*

DePaolo also alleged that Palmer displayed favoritism toward the hotel's chef because he was permitted to purchase the equipment he wanted. *Id.* ¶ 92. However, when DePaolo was asked whether there was any equipment that he had asked for but did not receive from Palmer, he responded, "No, I have a big hammer." *Id.* He clarified that this meant, "No." *Id.*

DePaolo mentioned that another manager, Jill St. Dennis, was treated better than him. *Id.* ¶ 93. He testified that she was treated "like a princess" and that people had to kowtow to her. *Id.* He could provide no other specifics on how Palmer treated her more favorably. *Id.*

After DePaolo refused to return to work, he filed for workers' compensation benefits. *Id.* ¶ 94. In documents submitted in support of that claim, he wrote that Palmer's harassment of him began in 2012 – prior to his lymphoma diagnosis – and continued to escalate until January 2015,

---

[9] DePaolo qualifies paragraphs 88 and 89, asserting that he explained during his deposition that he was not trying to hold grudges, did like his job and liked Palmer, but did not like the way Palmer treated him. SMF ¶¶ 88-89; DePaolo Dep., Page ID # 242 at 154.

when he decided to take FMLA leave. *Id.* ¶ 95. He added that Palmer's harassment of him "really

escalated end 2014 - Jan 2015 so bad went out on 12 weeks FMLA." SMF ¶ 95; Missing First

Report Worksheet (ECF No. 53-10), Page ID # 301.

Prior to DePaolo's chemotherapy treatment, he and Palmer had disagreements at work, but

their disagreements never seemed serious or hostile until 2014. SMF ¶ 96; Declaration of Steven

Inman ("Inman Decl.") (ECF No. 58-1) ¶ 2. During the period in which DePaolo was undergoing

chemotherapy and until he went on leave in January 2015, Palmer became extremely critical and

hostile toward him. SMF ¶ 97; Inman Decl. ¶ 3.[10] Palmer was very aggressive toward DePaolo

and would frequently yell and scream in a way that he never had before DePaolo got sick. SMF

¶ 98; Inman Decl. ¶ 4.[11] Inman heard Palmer refer to DePaolo as "chemo-brain" and refer to his

"chemo-brain" on several occasions. SMF ¶ 99; Inman Decl. ¶ 5. Once, while in the hotel lobby,

Inman heard Palmer say, "Cary has 'chemo-brain.'" *Id.* DePaolo was not present at that time.

*Id.*[12]

When DePaolo went on leave in January 2015, Palmer offered his position as Chief of

Maintenance to Inman. SMF ¶ 101. Inman told Palmer that he was concerned about creating

---

[10] I deny GHM's request to strike paragraph 97 on the bases that it lacks the specificity required by Federal Rule of Civil Procedure 56(e) (now 56(c)(4)) and is conclusory. The case on which GHM relies, *Perez v. Volvo Car Corp.*, 247 F.3d 303, 316 (1st Cir. 2001), is distinguishable. In the passage quoted by GHM, the First Circuit stated: "Statements predicated upon undefined discussions with unnamed persons at unspecified times are simply too amorphous to satisfy the requirements of Rule 56(e), even when proffered in affidavit form by one who claims to have been a participant." *Perez*, 247 F.3d at 316. However, the affiant in *Perez* indicated that his statements were based on "personal discussions with various Volvo representatives[,]" *id.*, thereby failing to demonstrate personal knowledge as required by the rule. By contrast, Inman, the current Chief of Maintenance at the Marriott at Sable Oaks, states that he has personal knowledge of the facts and circumstances surrounding Palmer's treatment of DePaolo during the period at issue, *see* Inman Decl. ¶ 1, and nothing in his declaration indicates otherwise. While Inman's statement is general, it is not conclusory. He describes a shift in the tenor of the relationship that he observed over a certain period of time. *See id.* ¶ 3; *compare Perez*, 247 F.3d at 316 (describing statement that there was "no doubt that Volvo did in fact know of the stickers' contents" as "conclusory rather than factual") (citation and internal quotation marks omitted).

[11] I deny GHM's request to strike paragraph 98 for the same reasons discussed with respect to paragraph 97.

[12] I grant GHM's request to strike paragraph 100, in which DePaolo states that he told Inman that he had spoken to Winston on multiple occasions about the way Palmer was treating him. The statement, which is supported by the Inman affidavit and appears to be offered for the truth of the matter asserted, is hearsay: Inman's recitation of what DePaolo told him. *See* Fed. R. Evid. 801(c).

confusion about the position when DePaolo returned, and that he had no problem with DePaolo resuming as Chief. *Id.* ¶ 102; Inman Decl. ¶ 7. Palmer responded that there would be no confusion because he had told DePaolo that "if he comes back, he can't be Chief anymore." *Id.*

Maintenance staff employee Michael Lano heard Palmer call DePaolo "chemo brain" on several occasions between late 2014 and early 2015. SMF ¶ 103; Declaration of Michael Lano ("Lano Decl.") (ECF No. 58-2) ¶ 2. On one occasion, when Lano, Palmer, and DePaolo were in the maintenance shop at the Marriott, Palmer called DePaolo a "chemo brain" to his face. SMF ¶ 104; Lano Decl. ¶ 3. On another occasion, Lano heard Palmer call DePaolo "chemo brain" under his breath when they both were in the hotel lobby. SMF ¶ 105; Lano Decl. ¶ 4. DePaolo was present, but Lano believed that he was too far away to hear him. *Id.* On a third occasion, Lano heard Palmer refer to DePaolo as "chemo brain" while walking through the back hall/room service area of the hotel. SMF ¶ 106; Lano Decl. ¶ 5. DePaolo was present, but Lano did not think he heard Palmer. *Id.*[13]

When Winston was asked at deposition whether she recalled DePaolo complaining to her about Palmer or any other issue involving his work conditions, she responded, "Cary would discuss work with me, yes." SMF ¶ 108; Deposition of Jennifer Winston ("Winston Dep.") (ECF No. 53-14), Page ID # 364 at 37. When read DePaolo's allegation from his complaint that "at the end of January 2015, Mr. DePaolo expressed frustration and complained to the manager about the deteriorating working relationship with Mr. Palmer, including the refusals to accommodate and verbal abuse[,]" and asked if she recalled DePaolo expressing frustration and complaining to her,

---

[13] I grant GHM's request to strike paragraph 107, in which DePaolo states that, in late January 2015, he told Lano that he had a meeting with Palmer and Winston in which they forced him to take leave for 12 weeks without pay, he had to step down from the Chief position and take a pay cut when he returned to work, and he did not want to go on leave or step down from his position. The statement, which is supported by the Lano declaration and appears to be offered for the truth of the matter asserted, is hearsay: Lano's recitation of what DePaolo told him, *see* Fed. R. Evid. 801(c).

Winston replied, "I don't know."  SMF ¶ 109; Winston Dep., Page ID # 364 at 38.  Winston also claimed that she did not know whether the "stress" that was the basis for DePaolo's FMLA application was caused by his working conditions.  SMF ¶ 110.  Palmer testified that Winston told him that DePaolo's FMLA leave was due to stress caused by his working conditions.  *Id*. ¶ 111.

When asked if she did or did not recall DePaolo complaining about harassment during his employment, Winston responded, "No, I don't know.  I don't recall."  *Id*. ¶ 112; Winston Dep., Page ID ## 366-67, at 48-49.  Winston testified that she did not recall whether DePaolo ever said that he had any problems or concerns with completing his full line of duties as chief engineer.  *Id*. ¶ 113; Winston Dep., Page ID # 367, at 49.  Winston admitted that she had confided in DePaolo about her own issues with Palmer in the past.  SMF ¶ 115.  She stated: "There are times when Ed was – I shouldn't – would ask me to do my job above and beyond, yes.  When you have a lot on your plate, it's hard to prioritize."  *Id*.

DePaolo testified that he believed Palmer was treating him differently because of his disability.  *Id*. ¶ 117.  DePaolo believed that his demotion was related to his disability.  *Id*. ¶ 118.  Palmer's treatment of DePaolo caused him to have severe anxiety that manifested in physical symptoms such as heart palpitations, nausea, vomiting, nightmares, violent thoughts, and the desire to hide or run away from the property.  *Id*. ¶ 119; DePaolo Dep., Page ID ## 241, 243 at 152, 161.  On February 20, while on FMLA leave, DePaolo discussed his work situation with his health care provider and told her that the stress at work was "close to unmanageable."  SMF ¶ 120.  He stated that "they are trying to push me out" and that he might "need to change jobs."  *Id*.  On April 1, 2015, DePaolo told his therapist that he planned to leave his employment because he did not feel he could "emotionally handle working in a hostile environment."  *Id*. ¶ 121.  DePaolo liked Winston but did not think that she was fair.  *Id*. ¶ 122.  He stated that she was "one sided" and

more favorable to Palmer when he had issues with Palmer. *Id.* He explained that he thought this because Palmer was her boss, and "usually you don't bite the hand that feeds you." *Id.*

### III. Discussion

As noted above, DePaolo has withdrawn his claims for disability discrimination predicated on a theory of "failure to accommodate" and FMLA retaliation. I find, for the reasons discussed below, that GHM fails to demonstrate its entitlement to summary judgment as to the remaining claims.

### A. Retaliation Claims Pursuant to the ADA, MHRA, and MWPA

GHM seeks summary judgment as to DePaolo's claims of retaliation in violation of the ADA, MHRA, and MWPA on the basis that he fails to generate a triable issue as to any of the three elements of a *prima facie* case that pertain to all three statutory schemes. *See* Motion at 5-12; *Morin v. Hannaford Bros. Co., LLC*, Docket no. 1:17-CV-50-GZS, 2018 WL 2746570, at \*14 (D. Me. June 7, 2018) (retaliation claims pursuant to the ADA, MHRA, and MWPA all require the plaintiff "to establish (1) that he was engaged in protected activity, i.e., availed himself of rights under the relevant statutes; (2) that he suffered a materially adverse action or was adversely affected; and (3) that there was a causal connection between the protected activity and the adverse action"). I agree with DePaolo, *see* Opposition at 4-10, that he generates triable issues as to each of these prongs.

### 1. Protected Activity

As relevant here, the MWPA prohibits employers from "discharge[ing], threaten[ing], or otherwise discriminat[ing] against an employee regarding the employee's compensation, terms, conditions, location or privileges of employment because . . . [t]he employee, acting in good faith, . . . reports orally or in writing to the employer . . . what the employee has reasonable cause to

believe is a violation of a law or rule adopted under the laws of this State, a political subdivision of this State or the United States[.]"  26 M.R.S.A. § 833(1)(A).

"Retaliation is prohibited under the MHRA whenever an 'individual has opposed any act or practice that is unlawful under [the MHRA] or because that individual made a charge, testified, assisted or participated in any manner in an investigation, proceeding or hearing under [the MHRA].'"  *Doyle v. Dep't of Human Servs.*, 2003 ME 61, ¶ 20, 824 A.2d 48, 55 (quoting 5 M.R.S.A. § 4633(1)).  The relevant provision of the ADA is nearly identical to that of the MHRA, proscribing discrimination "against any individual because such individual has opposed any act or practice made unlawful by this chapter or because such individual made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this chapter."  42 U.S.C. § 12203(a).

DePaolo notes that, against the backdrop that Palmer had referred to him on a number of occasions, both in his presence and to other employees, as a "chemo brain," he complained in his meeting with both Palmer and Winston on January 20, 2015, that, during a prior meeting, Palmer had called him a "chemo brain."  *See* Opposition at 10; SMF ¶ 77; 1/21/15 Winston Note, Page ID # 393.

GHM rejoins that this "offhand remark while being verbally counseled, and which did not specifically mention disability discrimination, does not constitute protected activity, especially where DePaolo admitted that he first used the term chemo brain to describe his memory loss while being disciplined by Palmer, which was exactly the same context in which Palmer[] allegedly used the term."  Defendant's Reply Memorandum of Law ("Reply") (ECF No. 63) at 6 (citing *Higgins v. New Balance Athletic Shoe, Inc.*, 194 F.3d 252, 262 (1st Cir. 1999), for the proposition that there

was "no protected activity where plaintiff did not assert there was a violation of Title VII or any other law in his complaint").

*Higgins* is distinguishable in that, there, the plaintiff "did not assert . . . that at the time he complained he believed [his co-worker's] distemper to be in violation of Title VII or any other law[.]" *Higgins*, 194 F.3d at 262. In this instance, DePaolo did not make a general or vague complaint of ill treatment: he complained that Palmer had referred to him as a "chemo brain." A reasonable jury could find that this derogatory allusion to DePaolo's known disability sufficed to place Winston, as his HR representative, on notice of a complaint of disability discrimination. That the complaint may have been a spontaneous remark made at a disciplinary meeting does not, as a matter of law, undercut its status as protected activity. *See, e.g., Soto-Feliciano v. Villa Cofresí Hotels, Inc.*, 779 F.3d 19, 31 (1st Cir. 2015) ("acceptable forms of protected activity under Title VII's analogous clause include not only formal charges of discrimination, but also informal protests of discriminatory employment practices, including making complaints to management") (citation and internal quotation marks omitted). Moreover, DePaolo lodged his complaint in the formal and serious setting of his disciplinary meeting with both his supervisor (Palmer) and HR representative (Winston).

DePaolo, accordingly, adduces sufficient evidence to avoid summary judgment on the protected-activity prong of his *prima facie* case.

### 2. Adverse Employment Action

GHM next contends that DePaolo fails to establish that he was subjected to an adverse employment action, arguing that his own testimony precludes him from asserting that he was demoted from Chief of Maintenance to a maintenance technician. *See* Motion at 8-11. It points out that DePaolo himself testified that the maintenance position was "offered" to him and that he

did not tell either Palmer or Winston that he did not want to take it.  *See id.* at 8.  It argues that, at best, the evidence viewed in the light most favorable to DePaolo reveals that he does not recall whether Palmer or Winston told him that he had to accept the position change.  *See id.* at 8-10.  It notes that inability to recall a point does not suffice to generate a triable issue of fact.  *See id.* at 10; *Linao v. GCR Tire Ctrs.*, Civil Action No. 2:09-CV-134-RWS, 2010 WL 4683508, at *5 (N.D. Ga. Nov. 12, 2010) ("[W]here the only evidence negating the existence of an event is a witness's failure to remember that event, other courts have declined to find a genuine issue of fact for summary judgment purposes.").

In so arguing, GHM takes too crabbed a view of DePaolo's cognizable evidence.  While DePaolo testified that he did not recall "specifics" of his conversations with Palmer and Winston on this point, he also testified that he had to step down to maintenance, *see* Motion at 9 (quoting DePaolo Dep., Page ID # 240 at 146-48), and that he was told that, if he wanted to come back from FMLA leave, he could return only in a general maintenance position, *see* SMF ¶ 78; DePaolo Dep., Page ID # 240 at 146.  It is undisputed that, just prior to that conversation, Palmer told DePaolo that he was considering demoting him.  *See* SMF ¶ 77.  Finally, DePaolo adduces evidence from Inman, who became Chief of Maintenance after DePaolo went out on FMLA leave, that Palmer told Inman that "if [DePaolo] comes back, he can't be Chief anymore."  SMF ¶ 102; Inman Decl. ¶ 7.

On this evidence, a reasonable fact-finder could conclude that DePaolo was demoted, satisfying his burden to show that he was subjected to an adverse employment action.  *See, e.g., Hernandez-Torres v. Intercontinental Training, Inc.*, 158 F.3d 43, 47 (1st Cir. 1998) (adverse employment actions include demotions).

### 3.  Causal Nexus

GHM finally argues that DePaolo's retaliation claim founders on the basis of his failure to demonstrate any nexus between his protected activity and an adverse employment action.  *See* Motion at 11-12.  Again, I disagree.

Crediting DePaolo's evidence that (i) Palmer became increasingly hostile to him following his cancer diagnosis, including repeatedly referring to him as a "chemo brain," *see* SMF ¶ 56; DePaolo Dep., Page ID # 232 at 114; SMF ¶¶ 96-99, 103-06; Inman Decl. ¶¶ 2-5; Lano Decl. ¶¶ 103-06, (ii) Palmer informed DePaolo on January 20, 2015, that he was considering demoting him, *see* SMF ¶ 77, (iii) immediately thereafter, DePaolo complained to Winston and Palmer about Palmer's prior use of the term "chemo brain," *see id*.; 1/21/15 Winston Note, Page ID # 393, and, (iv) less than two weeks later, DePaolo was demoted, *see* SMF ¶ 78; DePaolo Dep., Page ID ## 239-40 at 145-46, a jury reasonably could infer that there was a nexus between DePaolo's protected activity and his demotion.[14]

For these reasons, I recommend that the court deny GHM's motion for summary judgment with respect to that portion of Count I alleging retaliation in violation of the ADA, MHRA, and MWPA.

### B.  Disability Discrimination Claims Pursuant to the ADA and MHRA

As this court has recently noted:

> Absent direct evidence of discrimination, courts are directed to use the familiar burden-shifting paradigm outlined by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S. Ct. 1817, 36 L.Ed.2d 668 (1973), in evaluating disability discrimination claims under the

---

[14] GHM cites *Muñoz v. Sociedad Española de Auxilio Mutuo y Beneficiencia de P.R.*, 671 F.3d 49, 56 (1st Cir. 2012), for the proposition that there is no causality when an adverse employment action was contemplated but not definitely determined before a protected activity occurred.  *See* Reply at 6.  However, in *Muñoz*, the employer decided to terminate the employee's employment about three weeks prior to his deposition (the protected activity), and its representative was unaware of the deposition when he delivered news of the termination the day afterward.  *See Muñoz*, 671 F.3d at 56.

ADA. To establish a prima facie case of disability discrimination under the ADA, a plaintiff must prove: (1) that [he or] she was disabled within the meaning of the ADA; (2) that [he or] she was able to perform the essential functions of [his or] her job with or without accommodation; and (3) that [he or] she was discharged or adversely affected, in whole or in part, because of [his or] her disability. If the plaintiff establishes a prima facie case, an inference of intentional discrimination is raised, and the burden of production shifts to the defendant to articulate a legitimate, non-discriminatory reason for its employment decision. Finally, if the defendant does so, the burden of production shifts back to the plaintiff, and the plaintiff must proffer evidence to establish that the defendant's non-discriminatory justification is mere pretext, cloaking discriminatory animus.

*Burnett v. Ocean Props., Ltd.*, __ F. Supp.3d __, 2:16-cv-00359-JAW, 2018 WL 2925126, at *25 (D. Me. June 11, 2018) (citations and internal quotation marks omitted). "The elements and procedures of [DePaolo's] state law claims for discrimination . . . are substantially the same as his federal claims, and courts construe and apply the MHRA along the same contours as the ADA." *Id*. at *34 (citation and internal quotation marks omitted).

GHM seeks summary judgment as to DePaolo's claims of disability discrimination in violation of the ADA and the MHRA on the bases that he fails to adduce sufficient evidence to establish two elements of his *prima facie* case – that he was subject to an adverse employment action and that he was treated less favorably than non-disabled employees – and that, in the absence of such comparator evidence, he cannot, at the final stage of the *McDonnell Douglas* burden-shifting analysis, rebut its showing that any adverse action was taken because of an egregious performance issue (that he was unreachable for two days in January 2015 following a flood at the hotel). *See* Motion at 12-15; Reply at 6-7.

For the reasons discussed above, DePaolo generates a triable issue that he was subjected to an adverse employment action. For the reasons discussed below, I conclude that he need not offer comparator evidence at any stage of analysis and that he adduces sufficient evidence to generate a triable issue whether his demotion was the product of discriminatory animus.

GHM cites *Ramos-Echevarría v. Pichis, Inc.*, 659 F.3d 182, 186 (1st Cir. 2011), for the proposition that, pursuant to *McDonnell Douglas*, an ADA plaintiff must adduce sufficient evidence that "he was treated less favorably than non-disabled employees[.]" Motion at 12-13. Yet, in that case, the First Circuit had no occasion to consider whether an ADA plaintiff must make such a showing in every case: it affirmed the district court's grant of summary judgment on the basis that the plaintiff had failed to show that he was disabled within the meaning of the ADA. *See Ramos-Echevarría*, 659 F.3d at 191.

As DePaolo notes, *see* Opposition at 13, this court recently rejected an argument nearly identical to that of GHM, citing *Conward v. Cambridge Sch. Comm.*, 171 F.3d 12, 19 (1st Cir. 1999), for the proposition that the plaintiff in a pregnancy-discrimination case was "*not* required to show that she was treated differently than other similarly situated employees outside the protected class as part of establishing her prima facie case" and that "the time to consider comparative evidence in a disparate treatment case is at the third step of the burden-shifting ritual, when the need arises to test the pretextuality *vel non* of the employer's articulated reason for having acted adversely to the plaintiff's interests[,]" *Norris v. City of Portland*, Docket No. 2:16-cv-390-NT, 2017 WL 3613024, at *2 (D. Me. Aug. 22, 2017) (emphasis in original).

GHM endeavors to distinguish *Norris* on the basis that it was a case involving pregnancy discrimination in violation of Title VII of the Civil Rights Act, citing three of this court's cases for the proposition that courts within the First Circuit have not followed this reasoning with respect to ADA claims. *See* Reply at 6-7 (citing *Morissette v. Cote Corp.*, 190 F. Supp.3d 193, 203 (D. Me. 2016); *Bouchard v. Gen. Elec. Co.*, Docket No. 1:14-cv-236-NT, 2015 WL 7258477, at *6 (D. Me. Nov. 17, 2015); *Crosby v. F.W. Webb, Co.*, Civil No. 2:12-cv-135-NT, 2014 WL 1268691, at *8 (D. Me. Mar. 26, 2014)).

However, in *Norris*, Chief Judge Torresen cited two ADA cases in observing that "[t]he same is true at the third step of the analysis[:] [a]lthough a plaintiff may choose to establish pretext by showing that she was treated differently than other similarly situated employees, she is not required to do so." *Norris*, 2017 WL 3613024, at *3 n.4 (citing *Swanson v. Correct Care Sols., Inc.*, 1:15-cv-383-GZS, 2017 WL 3275986, at *5 n.6 (D. Me. Aug. 1, 2017) (rec. dec., *aff'd* Sept. 5, 2017), and *LaFlamme v. Rumford Hosp.*, No. 2:13-cv-460-JDL, 2015 WL 4139478, at *16 n.44 (D. Me. July 9, 2015)).

Indeed, in both *Swanson* and *LaFlamme*, this court rejected the precise argument advanced here. *See Swanson*, 2017 WL 3275986, at *5 n.6 ("Even when a disparate treatment argument is made, a plaintiff is not necessarily required to demonstrate disparate treatment as part of the prima facie case. . . . In addition, comparator evidence is not a required component of every pretext showing. . . . Plaintiffs can show that an employer's stated reasons are pretextual in any number of ways.") (citation and internal quotation marks omitted); *LaFlamme*, 2015 WL 4139478, at *16 n.44 (same).

*Morissette*, *Bouchard*, and *Crosby* cannot fairly be read to hold otherwise. The plaintiffs in *Morissette* and *Crosby* presented comparator evidence, obviating any need for the court to consider whether such evidence is required in all instances, *see Morissette*, 190 F. Supp.3d at 206-07; *Crosby*, 2014 WL 1268691, at *9, and, in *Bouchard*, the court found a triable issue of pretext in the absence of such evidence, *see Bouchard*, 2015 WL 7258477, at *6-7.

This is fatal to GHM's bid for summary judgment as to DePaolo's disability discrimination claims.

In any event, a reasonable jury crediting the accounts of DePaolo, Inman, and Lano could conclude that, despite DePaolo's performance issues, the demotion would not have occurred but

for disability-based discriminatory animus, given a marked change in Palmer's treatment of DePaolo beginning at about the time of DePaolo's chemotherapy, when Palmer became highly critical of him, sometimes yelling and screaming at him and once even standing nose-to-nose with him screaming, *see* SMF ¶ 47; DePaolo Dep., Page ID # 225 at 86-87; SMF ¶ 56; DePaolo Dep., Page ID # 232 at 114; SMF ¶¶ 96-98; Inman Decl. ¶¶ 2-4, and repeatedly used the term "chemo brain," both to DePaolo's face and in front of others, *see* SMF ¶ 56; DePaolo Dep., Page ID # 232 at 114; SMF ¶ 99; Inman Decl. ¶ 5; SMF ¶¶ 103-06; Lano Decl. ¶¶ 2-5. *See also, e.g., Resare v. Raytheon Co.*, 981 F.2d 32, 42 (1st Cir. 1992) ("To show pretext, a plaintiff must present evidence either that a discriminatory reason more likely motivated the employer or that the employer's justification is questionable or unworthy of belief. Pretext can be exposed in several different ways[.]") (citation and internal quotation marks omitted).

For these reasons, I recommend that the court deny GHM's motion for summary judgment with respect to that portion of Count I alleging disability discrimination in violation of the ADA and MHRA.

### C. Hostile Work Environment Claims Pursuant to the ADA and MHRA

GHM next seeks summary judgment as to DePaolo's claims that he was subjected to a hostile work environment in violation of the MHRA, ADA, and MWPA, asserting that, while Palmer's relationship with DePaolo was turbulent, it did not rise to that level. *See* Motion at 15-19.

The First Circuit has recognized that a plaintiff may maintain a claim for disability harassment under a hostile work environment theory. *See, e.g., Murray v. Warren Pumps, LLC*, 821 F.3d 77, 86 (1st Cir. 2016). "To succeed, a hostile work environment claim requires, in addition to proof of other elements, evidence that the discriminatory conduct was

sufficiently severe or pervasive so as to alter the conditions of employment and create an abusive work environment." *Id*. (citations and internal quotation marks omitted).[15]

"Under First Circuit law, determining whether harassment is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment depends on all the relevant circumstances." *Richardson v. Mabus*, 203 F. Supp.3d 86, 160 (D. Me. 2016) (citations and internal punctuation omitted). "Relevant factors include the severity of the conduct, its frequency, and whether it unreasonably interfered with the victim's work performance." *Id*. (citation and internal quotation marks omitted). "The law is without a mathematically precise test to determine whether a plaintiff presents sufficient evidence of a severely and pervasively hostile work environment, but the thrust of this inquiry is to distinguish between the ordinary, if occasionally unpleasant, vicissitudes of the workplace and actual harassment." *Id*. (citations and internal punctuation omitted).

GHM contends that DePaolo makes an insufficient showing to cross this threshold, noting that (i) he admitted that he informed Palmer of the term "chemo brain" as a way to describe his memory issues associated with chemotherapy, (ii) DePaolo waffled as to whether Palmer called him a "chemo brain" on more than one occasion, (iii) DePaolo hinges his hostile work environment claim primarily on the October 2014 nose-to-nose incident but testified that Palmer never referred to his disability at that time and that he did not remember what led to the incident, and (iv) DePaolo does not remember when other incidents of which he complains occurred. *See* Motion at 17-19. It posits that the incidents on which DePaolo relies "do not rise to the level of a hostile working

---

[15] The MHRA also requires, *inter alia*, a showing "that the harassment was sufficiently severe or pervasive so as to alter the conditions of [a] plaintiff's employment and create an abusive work environment[.]" *Watt v. UniFirst Corp.*, 2009 ME 47, ¶ 22, 969 A.2d 897, 902 (citation and internal quotation marks omitted).

environment, and instead are symptoms of the 'vicissitudes of the workplace' rather than severe and pervasive harassment." *Id.* at 19 (citation omitted).

Nonetheless, viewing the evidence in the light most favorable to DePaolo as nonmovant, I conclude that he makes out a triable issue on his claim that he was subjected to a disability-based hostile work environment. A reasonable jury crediting the accounts of DePaolo, Inman, and Lano could conclude that there was a marked change in Palmer's treatment of DePaolo beginning at about the time of DePaolo's chemotherapy, at which point Palmer became highly critical of him and hostile toward him, began frequently yelling and screaming at him, and referred to him on multiple occasions as a "chemo brain." *See, e.g.,* SMF ¶ 47; DePaolo Dep., Page ID # 225 at 86-87; SMF ¶ 56; DePaolo Dep., Page ID # 232 at 114; SMF ¶¶ 96-99; Inman Decl. ¶¶ 2-5; SMF ¶¶ 103-06; Lano Decl. ¶¶ 2-5.

Even setting aside incidents that DePaolo has not shown occurred during the relevant period, the October 2014 nose-to-nose incident, as described by DePaolo, was hardly commonplace. DePaolo testified that he felt "threatened" by Palmer, "degraded," "frustrated," "red in the face, hurt, disappointed, scared [and] protective." SMF ¶ 51; DePaolo Dep., Page ID # 225 at 86-87. While Palmer did not refer to DePaolo's disability during that incident, a reasonable jury could infer, on the totality of the evidence, that his hostility emanated from DePaolo's disability.

Further, DePaolo adduces evidence that Palmer's treatment of him caused heart palpitations, nausea, vomiting, nightmares, violent thoughts, and a desire to hide or run away from the property, SMF ¶ 119; DePaolo Dep., Page ID ## 241, 243 at 152, 161, and that Palmer testified that Winston told him that DePaolo's FMLA leave in January 2015 was due to workplace stress, *see* SMF ¶ 111.

At bottom, the evidence viewed in the light most favorable to DePaolo paints a picture of a work setting more closely matching the description of "an abusive working environment" than one filled with "the ordinary, if occasionally unpleasant, vicissitudes of the workplace[.]" *Richardson*, 203 F. Supp.3d at 160 (citations and internal quotation marks omitted).

For these reasons, I recommend that the court deny GHM's motion for summary judgment with respect to that portion of Count I alleging that DePaolo was subjected to a disability-based hostile work environment in violation of the ADA and MHRA.

### D.  Claim of Interference with Exercise of Rights Under FMLA

GHM finally seeks summary judgment as to DePaolo's claim in Count II of interference with the exercise of his rights pursuant to the FMLA.  *See* Motion at 20-23.

"In order to make out a prima facie case for FMLA interference, a plaintiff must show that (1) [he or] she was eligible for the FMLA's protections; (2) [his or] her employer was covered by the FMLA; (3) [he or] she was entitled to leave under the FMLA; (4) [he or] she gave [his or] her employer notice of [his or] her intention to take leave; and (5) [his or] her employer denied [his or] her FMLA benefits to which [he or] she was entitled." *Kempton v. Delhaize Am. Shared Servs. Grp. LLC*, 2:14-cv-00494-JDL, 2016 WL 1069647, at *4 (D. Me. Mar. 17, 2016).  "Motive is generally irrelevant to an interference claim." *Id.*  "The issue is simply whether the employer provided its employee the entitlements set forth in the FMLA – for example, a twelve-week leave or reinstatement after taking a medical leave." *Id.* (citation and internal quotation marks omitted).

GHM argues that, assuming DePaolo's interference claim is predicated on the alleged failure to reinstate him to the Chief of Maintenance position following his FMLA leave, his claim founders because he fails to generate a triable issue that he was involuntarily relieved of a position he desired to keep.  *See* Motion at 22-23.  I have found otherwise, for the reasons discussed above.

Accordingly, I recommend that the court deny GHM's motion for summary judgment with respect to that portion of Count II alleging FMLA interference.

### IV.  Conclusion

For the foregoing reasons, I recommend that the court **GRANT** the Motion in part, as to DePaolo's claims in Count I of disability discrimination based on a theory of failure to accommodate and his claim in Count II of FMLA retaliation, and otherwise **DENY** it.  Should the court agree, remaining for trial will be DePaolo's claims in Count I of retaliation, disability discrimination based on a theory of disparate treatment, and creation of a disability-based hostile work environment, and in Count II of FMLA interference.

### *NOTICE*

*A party may file objections to those specified portions of a magistrate judge's report or proposed findings or recommended decisions entered pursuant to 28 U.S.C. § 636(b)(1)(B) for which de novo review by the district court is sought, together with a supporting memorandum, within fourteen (14) days after being served with a copy thereof.   A responsive memorandum shall be filed within fourteen (14) days after the filing of the objection.*

*Failure to file a timely objection shall constitute a waiver of the right to de novo review by the district court and to appeal the district court's order.*

Dated this 10th day of August, 2018.

/s/ John H. Rich III
John H. Rich III
United States Magistrate Judge